1
2
3
4
5
6
7
8

9                    **UNITED STATES DISTRICT COURT**

10                    **EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  BARBARA L. CHAMP, | ) Case No.: 1:20-cv-00018-JLT |
| 12          Plaintiff, | ) ORDER GRANTING PLAINTIFF'S REQUEST<br>) FOR JUDICIAL REVIEW (DOC. 21) AND |
| 13      v. | ) DENYING THE COMMISSIONER'S REQUEST<br>) TO AFFIRM THE ADMINISTRATIVE<br>) DECISION (DOC. 25) |
| 14 | ) |
| 15  KILOLO KIJAKAZI,[1]<br>Acting Commissioner of Social Security, | ) ORDER REMANDING THE ACTION<br>) PURSUANT TO SENTENCE FOUR OF 42 U.S.C. |
| 16 | ) § 405(g) |
| 17          Defendant. | ) ORDER DIRECTING ENTRY OF JUDGMENT IN<br>) FAVOR OF BARBARA CHAMP, AND AGAINST |
| 18 | ) DEFENDANT, KILOLO KIJAKAZI, ACTING<br>) COMMISSIONER OF SOCIAL SECURITY |
| 19 | ) |

20          Barbara Champ asserts she is entitled to disability insurance benefits and a period of disability

21  under Title II of the Social Security Act.  Plaintiff seeks judicial review of the decision denying her

22  application for benefits, asserting that the administrative law judge erred in evaluating the medical

23  record and her statements concerning the severity of her symptoms. (*See generally* Doc. 21.)  For the

24  reasons set forth below, the Court finds the ALJ erred in evaluating the medical evidence and the

25  matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

26

27

28          [1] This action was originally filed against Andrew Saul in his capacity as the Commissioner of Social Security.
The Court has substituted Kilolo Kijakazi, who has since been appointed the Acting Commissioner of Social Security, as
the defendant.  *See* Fed. R. Civ. P. 25(d).

## BACKGROUND

In May 2016, Plaintiff applied for benefits, asserting disability beginning September 11, 2015, due to depression, post-traumatic stress disorder, restless leg syndrome, high blood pressure, and a transient ischemic attack.  (Doc 14-1 at 86.) The Social Security Administration denied the application both at the initial level and upon reconsideration.  (*See id.* at 66-104.)  Plaintiff requested an administrative hearing and testified before an ALJ on October 25, 2018.  (*See id.* at 15, 35.)  The ALJ found Plaintiff was not disabled and issued an order denying benefits on December 5, 2018.  (*Id.* at 15-27.)  Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on November 8, 2019.  (*Id.* at 5-9.)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether substantial evidence supports the administrative decision or whether the decision is based on legal error.  42 U.S.C. § 405(g).

The Court must uphold the ALJ's determination if the proper legal standards were applied and substantial evidence supports the findings. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). "The court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

The Commissioner established a sequential five-step process for evaluating a claimant's alleged disability to achieve uniform decisions.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The process requires the ALJ to determine whether Plaintiff (1) is engaged in substantial gainful activity; (2) had medically determinable severe impairments; (3) that met or equaled one of the listed impairments outlined in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work; or (5) the ability to perform other work existing in significant numbers at the state and national level.  *Id.*

Pursuant to the five-step process, the ALJ first determined Plaintiff had "not engaged in substantial gainful activity during the period from her alleged onset date of September 11, 2015, through her date last insured of June 30, 2018."  (Doc. 14-1 at 17.)  Second, the ALJ found Plaintiff's severe impairments included: "major depressive disorder, generalized anxiety disorder, and history of transient ischemic attack with bradycardia."  (*Id.*)  At step three, the ALJ determined Plaintiff's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R.§ 404.1520(d), 20 C.F.R. § 404.1525, and 20 C.F.R. § 404.1526.  (*Id.* at 18-19.)  Next, the ALJ found:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except she can never climb ladders, ropes, or scaffolds; must avoid even moderate exposure to unprotected heights and dangerous moving machinery; is able to understand and complete simple instructions; cannot work on assembly lines or similar production-paced work jobs; and cannot work with the general public.

(Doc. 14-1 at 19.)  With this residual functional capacity, the ALJ determined at step four that Plaintiff

1   "was unable to perform any past relevant work." (*Id.* at 25.) However, the ALJ found "there were

2   jobs that existed in significant numbers in the national economy that the claimant could have

3   performed." (*Id.* at 26.) Thus, the ALJ concluded Plaintiff was "not under a disability, as defined by

4   the Social Security Act" from her alleged onset date through the date last insured. (*Id.* at 27.)

5   <u>**DISCUSSION AND ANALYSIS**</u>

6   Plaintiff contends the ALJ erred by rejecting Plaintiff's testimony regarding her symptoms and

7   level of limitation. (Doc. 21 at 8.) In addition, Plaintiff asserts the ALJ erred in evaluating the medical

8   opinions related to her mental impairments. (*Id.* at 25.) On the other hand, the Commissioner argues

9   the ALJ's decision should be affirmed because substantial evidence supports the ALJ's findings, and

10  the findings are free from legal error. (*See generally* Doc. 25 at 9-23.)

11  **A.      Evaluation of Plaintiff's Subjective Statements**

12  Plaintiff testified at administrative hearing in October 2018, at which time she was sixty-six

13  years old. (Doc. 14-1 at 36.) She said that she last worked in September 2015, as an auditor for

14  Account Control Technology, evaluating whether student loan accounts were eligible for collections.

15  (*Id.* at 36-37, 49.) Plaintiff stated her work history also included working as the "front office manager"

16  for a dental office and being the office manager for another company. (*Id.* at 50.) She explained her

17  responsibilities included "job costing," setting up spreadsheets, turning in payroll reports, and ensuring

18  coworkers in the field had hotel rooms and meal tickets. (*Id.*).

19  She testified she was humiliated and laughed at while working at Account Control Technology,

20  and she felt "there was a lot of age discrimination." (Doc. 14-1 at 51.) Plaintiff explained that due to

21  the harassment, she started having headaches, memory loss, anxiety, and depression. (*Id.* at 51-52, 54.)

22  She reported her headaches "started mainly at work," so she was told to see an occupational physician.

23  (*Id.* at 52.) Plaintiff reported the occupational physician found her blood pressure too high and the

24  physician "could not release [Plaintiff] to go back to work." (*Id.*) Plaintiff said that is "when all the

25  problems started," because she "would be off work for like six weeks and then … go back for a week or

26  so," only to be taken off work. (*Id.*) Plaintiff reported she became unable "to remember things," and

27  her team leader said: "are you just stupid or what" in front of group of people. (*Id.*) She testified she

28  also had panic attacks, "two or three, maybe four a day" by the end of her employment in 2015. (*Id.*)

Plaintiff reported her panic attacks continued after she stopped working, but they decreased in frequency to "maybe one or two a month." (Doc. 14-1 at 55.) Plaintiff stated she could "function very well within the walls of [her] home." (*Id.*) She said a couple friends who knew Plaintiff "need[ed] to get out of the house" would take her out "every once in a while," although she did not like to do so. (*Id.* at 55-56.) She explained she felt anxious about leaving home and "had panic attacks in the grocery store" while still working. (*Id.* at 56.) She testified she continued to dislike crowds, but her therapist told her she had to make herself "go out and be in situations where there are different people." (*Id.* at 56.) However, Plaintiff said she "always [went] with somebody in [her] family" if she had to go out. (*Id.* at 56-57.) She explained that because "Bakersfield is a small town," she was afraid of running into her former coworkers from Account Control Technology. (*Id.* at 57; *see also id.* at 60.)

In addition, Plaintiff said she had "a lot of bouts of depression." (Doc. 14-1 at 58.) She estimated that "three fourths of [each] month," she felt "very depressed." (*Id.*) Plaintiff reported she would "just stay in bed" due to depression "[t]wo or three days a week." (*Id.*) She said that when depressed, she avoided going out and interacting. (*Id.*) She reported she looked for other work when she wanted to leave Account Control Technology "because [she] was looking for a better work situation, but… was not successful at all at finding any other employment." (*Id.* at 61.) Plaintiff believed she was not a good candidate for work because she "can't get up and get [herself] out of the house." (*Id.*)

### 1.    Standards for reviewing a claimant's statements

In evaluating a claimant's statements about the severity of his symptoms, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if there is no evidence of malingering, the ALJ must make specific findings on credibility by setting forth clear and convincing reasons for rejecting a claimant's subjective complaints. *Id.* at 1036.

If there is objective medical evidence of an impairment, an ALJ may not discredit a claimant's testimony to the severity of symptoms merely because it is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48. The Ninth Circuit explained:

1

2

3

4

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the *Cotton* test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

5    *Smolen v. Chater* 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in *Cotton v.*

6    *Bowen*, 799 F.2d 1403 (9th Cir. 1986)).  Further, an ALJ is directed to identify "specific reasons for the

7    weight given to the individual's symptoms" so that the claimant "and any subsequent reviewer can

8    assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling[2] 16-3p, 2017

9    WL 5180304; *see also Moisa v. Barnhart,* 367 F.3d 882, 885 (9th Cir. 2004) (findings "must be

10   sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony

11   on permissible grounds and did not arbitrarily discredit the claimant's testimony").

12        An ALJ may consider additional factors to assess a claimant's statements, including, for

13   example, (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between

14   testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately

15   explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from

16   physicians about the nature, severity, and effect of the symptoms of reported by a claimant. *Fair v.*

17   *Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir.

18   2002) (an ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a

19   claimant's testimony and conduct, and a claimant's daily activities).

20        2.    The ALJ's Findings

21        Addressing Plaintiff's statements concerning her impairments and the severity of her symptoms,

22   the ALJ stated:

23

24

25

26

> At the hearing, the claimant testified since the work-related trauma, she gets panic attacks once or twice a month, as well as symptoms including headaches; however, again, she admitted that though she does not like crowds, she will still go out, generally with her family. The claimant testified she feels depressed about three quarters of the month and prefers to stay in bed two to three days a week, avoiding going out, interacting, and shopping. She testified to headaches once or twice a month, which can last a couple hours or a day. The claimant testified she has tried obtaining

27

28

[2] Social Security Rulings (SSRs) are "final opinions and orders and statements of policy and interpretations" issued by the Commissioner. 20 C.F.R. § 402.35(b)(1). The Ninth Circuit gives the Rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

other work but was not successful.

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Doc. 14-1 at 20.)  In making this finding, the ALJ considered the objective medical record, Plaintiff's daily activities, and the effectiveness of the treatment. (*See id.* at 20-22.)

> a.      *Objective medical evidence*

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis"). Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in evaluating her subjective complaints.

However, if an ALJ cites the medical evidence, it is not sufficient for the ALJ to simply state that the record contradicts the testimony. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Instead, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (ALJ must identify "what evidence suggests the complaints are not credible").  Plaintiff contends the ALJ failed to carry this burden and did not "clearly identify any inconsistency" regarding her statements and the objective medical evidence.  (Doc. 21 at 13.)

The ALJ noted Plaintiff alleged difficulty with social functioning, "remembering (such as forgetting spoken instructions hallway through at times), completing tasks, concentrating, handling

changes in routine, and understanding and following instructions." (Doc. 14-1 at 19.) The ALJ

acknowledged Plaintiff presented with "tearfulness; labile, restricted, or flat affect; depressed and/or

anxious mood; and significant difficulty with serial-seven and serial-three calculations." (*Id.* at 20,

citing Exh. 2F: 4 [Doc. 14-1 at 354]; Exh. 6F: 199 [Doc. 14-1 at 679]; Exh. 8F [Doc. 14-1 at 896-902];

Exh. 14F: 420 [Doc. 14-1 at 1396].)  However, the ALJ found "objective findings and treating-source

observations" on Plaintiff's mental status were generally normal. (*Id.* at 21.)  For example, the ALJ

noted the objective medical evidence included:

> appropriate dress and hygiene; punctual and cooperative manner with appropriate mood
> and affect; normal speech; normal psychomotor behavior; normal perception with no
> auditory hallucinations or other perceptual disturbances; normal thought process with
> no evidence of delusions, magical thinking, or loose associations; age-appropriate fund
> of knowledge and intact abstract thinking; and normal thought content with no
> compulsions, obsessions, or deep-seated phobias.

(Doc. 14-1 at 21, citing Exh. 2F [Doc. 14-1 at 347-395]; Exh. 3F: 2 [Doc. 14-1 at 401]; Exh. 6F: 198,

208, 218-219, 236-237, 263, 352 [Doc. 14-1 at 678, 688, 698-699, 743, 832]; Exh. 8F [Doc. 14-1 at

896-902]; Exh. 14F: 818, 826, 1029 [Doc. 14-1 at 1767, 1775, 1978].)  In addition, the ALJ found

Plaintiff "was able to perform simple arithmetic" and "had unimpaired judgment, good insight, and

unimpaired impulse control."  (*Id.*)

Further, the ALJ found Plaintiff's "physical findings on clinical examination were also

generally within normal limits." (Doc. 14-1 at 21.)  For example, the ALJ noted the record indicated:

> normal cardiovascular findings (including normal rate and rhythm), generally normal
> imaging findings with minimal abnormalities, no edema, no musculoskeletal
> abnormalities, and no focal neurological deficit.  Physical therapy notes reported
> observations of good functional strength and balance with mobility.  On examination,
> she was able to get up out of a chair and walk to an exam room without assistance, sit
> comfortably easily get on and off an exam table, easily bend at the waist and take her
> shoes and socks off and put them back on, and spontaneously bring her ankles to her
> knees to take off her socks.  She had normal station and gait, as well as normal
> electromyogram (EMG)/nerve conduction study (NCS)…

(*Id.*, citing e.g., Exh. 3F: 1-2, 17, 48, 53 [Doc. 14-1 at 400-01, 416, 452]; Exh. 6F: 199, 351-352 [Doc.

14-1 at 679, 831-32]; Exh. 7F [Doc. 14-1 at 892-897]; Exh. 14F: 99-100, 115-116, 153, 386-387, 420,

818, 826, 852, 897, 976, 1028 [Doc. 14-1 at 1048-49, 1064-65, 1102, 1335-36, 1369, 1767, 1775, 1801,

1846, 1925, 1977].)  In addition, the ALJ found Plaintiff had unremarkable lab results, a normal sinus

rhythm with an EKG, and no evidence of acute cardiopulmonary disease in x-rays.  (*Id.*, citing Exh.

14F: 830, 845, 901, 980 [Doc. 14-1 at 1779, 1794, 1850, 1929].)

Because the ALJ satisfied the burden to identify specific clinical findings and objective evidence inconsistent with Plaintiff's statements concerning debilitating symptoms, the objective medical record supports the ALJ's decision to reject Plaintiff's statements. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

### b.      *Plaintiff's activities*

A claimant's level of activity may be sufficient to support an ALJ's determination to give less weight to her subjective statements.  *See, e.g., Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008).  For example, the Ninth Circuit determined the ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding of credibility.  *See Stubbs-Danielson*, 539 F.3d at 1175.  An ALJ may also conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, gardens, and participates in community activities. *Valentine*, 574 F.3d at 693.  Similarly, a claimant's ability to care for personal needs, "prepare easy meals, do light housework, and shop for some groceries," may be viewed as "inconsistent with the presence of a condition which would preclude all work activity." *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1990).  The Ninth Circuit explained, "Even where ... activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Stubbs-Danielson v. Astrue*, 539 F.3d at 1175; *see also Burch*, 400 F.3d at 681.

The ALJ observed that Plaintiff "was able to maintain independent personal care without problems or reminders, manage her own medications without reminders or help, prepare meals daily, do laundry, iron, help care for a pet dog, and shop for necessities."  (Doc. 14-1 at 21.)  These activities are similar to those found sufficient in *Stubbs-Danielson* to support the ALJ's rejection of the claimant's statements.  *See id.*, 539 F.3d at 1175.  In addition, the ALJ observed that Plaintiff was able to engage in social activities despite her concerns including, visiting with others, maintaining "several close friendships," spending time with other on the phone, attending church, eating at restaurants, shopping in stores, and playing Bunco.  (*Id.*)  Furthermore, the ALJ found Plaintiff's ability to focus

and perform simple tasks was supported by her ability "to follow written instructions, crochet and work on crafts, and play computer games and Bunco." (*Id.*)

As the Ninth Circuit explained, "Although the evidence of [the plaintiff's] daily activities may also admit of an interpretation more favorable to [her], the ALJ's interpretation was rational, and [the court] 'must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Burch*, 400 F.3d at 680 (quoting *Magallanes*, 881 F.2d at 750). Thus, the activities identified by the ALJ support the decision to give less weight to her testimony concerning the severity of her symptoms.

### c.    *Effectiveness of treatment*

When evaluating a claimant's subjective statements, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication." 20 C.F.R. §§ 404.1529(c), 416.929(c). Importantly, when medication can effectively control an impairment, the impairment cannot be considered disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). Thus, where an ALJ finds a claimant's treatment is effective, such a finding supports a decision to reject a claimant's statements. *See, e.g., Odle*, 707 F.2d at 440.

The ALJ found "[t]reating records generally reflect that the claimant's psychiatric symptoms (including mood, sleep, and anxiety) improved with medications without significant side effects, therapy was helpful, and she reported manageable anxiety levels with relaxation methods, consistent with effective treatment and seemingly inconsistent with symptoms of the disabling severity alleged." (Doc. 14-1 at 22, citing Exh. 6F: 207, 236, 256, 320, 372, 377, 400 [Doc. 14-1 at 687, 716, 736, 800, 852, 857, 880; Exh. 9F: 14-15, 17 [Doc. 14-1 at 920-921, 923].)

As the ALJ cited, in October 2015, Plaintiff reported her mood improved with Zoloft without any side effects, and in November 2015, Plaintiff reported her sleep improved as well with Seroquel. (Doc. 14-1 at 22, 687, 716.)  In the cited treatment record from December 2015, Plaintiff reported her condition as "stable and improving" on her current medications "without any major side effects." (*Id.* at 736.)  The ALJ also referred to the treatment record of a therapy session dated March 29, 2016, which indicated therapy and relaxation methods successfully helped Plaintiff process her feelings and manage her anxiety levels.  (*Id.* at 22, 800.)  During a follow-up therapy session in May 2016—which

10

the ALJ also cited—Plaintiff reported her anxiety improved and she had "not felt depressed for several weeks." (*Id.* at 22, 852.)  Further, in May 2016, Plaintiff had good motivation, improved energy, and could tolerate being in public more on Zoloft and Seroquel.  (*Id.* at 857.)  During another therapy session from September 2016, Plaintiff reported having a panic attack at church but did not leave the service because she managed her symptoms using deep breathing and muscle relaxation techniques. (*Id.* at 22, 920.)

On the other hand, the ALJ does not make a finding that Plaintiff's symptoms improved to the point that she would be able to function in the workplace. As the Ninth Circuit indicated, "That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace." *Holohan v. Massanari*, 246 F.3d 1195, 1204 (9th Cir. 2001).  Thus, this factor offers only limited support for the ALJ's decision to reject Plaintiff's testimony.

>    d.    *Failure to comply with treatment*

The Regulations caution claimants that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work." 20 C.F.R. §§ 404.1530(a), 416.930(a). If a claimant fails to follow the prescribed treatment without an acceptable reason, the Commissioner "will not find [the claimant] disabled."  20 C.F.R. §§ 404.1530(b), 416.930(b). Accordingly, the Ninth Circuit determined, "an unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment . . . can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603. Therefore, noncompliance with a prescribed course of treatment is a clear and convincing reason for finding a plaintiff's subjective complaints lack credibility. *Id.*; *see also Bunnell*, 947 F.2d at 346.

The ALJ noted that Plaintiff refused to participate in a recommended intensive outpatient program when it was offered, because she would rather "'try to find someone else who would give her an off[-]work order.'" (Doc 14-1 at 22.) The ALJ found that despite Plaintiff's alleged limiting psychiatric symptoms, Plaintiff's failure to comply with treatment raised the question of whether she was looking to find "mental health care to generate evidence for her disability application and appeal," or if she was genuinely attempting to improve her alleged limiting symptoms. (Doc. 14-1 at 22, citing

Exh. 6F: 194 [Doc 14-1 at 674].) In addition, the ALJ considered the fact that Plaintiff requested to delay cardiac monitoring because she wanted to go on vacation. (*Id.*).

Plaintiff contends the ALJ failed to acknowledge that Plaintiff refused to participate in the outpatient program, because she believed it would not be helpful.  (Doc. 21 at 14.)  According to Plaintiff, her statements are still credible even if she did not think the program would be effective. (*Id.*) However, the Regulations identify the "[a]cceptable reasons for failure to follow prescribed treatment," including:

> (1)  The specific medical treatment is contrary to the established teaching and tenets of your religion.
> (2)  The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
> (3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
> (4)  The treatment because of its enormity (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
> (5)  The treatment involves amputation of an extremity, or a major party of an extremity.

20 C.F.R. §§ 404.1530(c), 416.930(c).  Thus, a claimant believing a treatment would not help is not an accepted reason excusing the failure to follow prescribed treatment.  *See id.*

When the evidence suggests lack of mental health treatment is part of a claimant's mental health condition, it may be inappropriate to consider a claimant's lack of mental health treatment as evidence that the claimant lacks credibility.  *See Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996). However, when there is no evidence suggesting a failure to seek treatment is attributable to a mental impairment rather than personal preference, it is reasonable for the ALJ to conclude the level or frequency of treatment is inconsistent with the severity of the complaints. *Molina*, 674 F.3d at 1113-14.

Plaintiff has not cited any evidence in the record that suggests her failure to participate in the recommended treatment should be attributed to her mental health impairments.  To the contrary, the evidence indicates her failure to comply with the recommended treatment was attributable to her personal preference and not her mental impairments.  As the ALJ noted, Plaintiff indicated she would "try to find someone else who would give her an off[-]work order" when the program was recommended, which raised "the question of whether she sought mental health care to generate evidence for her disability application and appeal, rather than in a genuine attempt to improve her

allegedly disabling symptoms." (Doc. 14-1 at 22, citing Exh. 6F:194 [*id.* at 674]).  In addition, the ALJ

considered Plaintiff requesting to delay monitoring because she wanted to go on vacation. (*Id.*)  Thus,

Plaintiff's failure to comply with the recommended treatment was a clear and convincing reason for

rejecting Plaintiff's statements.

>              *e.*      *Intent to work*

The ALJ observed Plaintiff "admitted to looking for other work after the alleged onset date and

was primarily unoptimistic because of her age, rather than functional limitations arising from allegedly

disabling impairments."  (Doc. 14-1 at 22.)  Plaintiff contends the ALJ improperly rejected Plaintiff's

statements, because "her mental issues remain a hurdle."  (Doc. 21 at 15.)

Significantly, the Ninth Circuit determined an ALJ may discount a claimant's credibility where

she has continued to search for work, as it "cast[s] doubt on a claim of disability" and demonstrates

that the claimant is able to work. *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014); *see also*

*Bray v. Comm'r of SSA*, 554 F.3d 1219, 1227 (9th Cir. 2009) (finding the ALJ properly considered the

fact that the clamant "sought out other employment").  As the ALJ observed, Plaintiff reported in

October 2015—after the alleged onset date—that she was looking for work but was "not optimistic

due to her age." (Doc. 14-1 at 693). Therefore, the record supports the ALJ's finding that Plaintiff

expressed an intent to work, and the ALJ properly considered this as a factor in evaluating Plaintiff's

allegations regarding the severity of her symptoms.

>              *f.*      *The ALJ's observations at the hearing*

The ALJ observed Plaintiff was able to "respond generally appropriately at the hearing." (Doc.

14-1 at 22.)  Plaintiff does not address the ALJ's observation, which is a proper factor for the ALJ to

consider.  *See Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1986) (when an ALJ includes personal

observations of a claimant during the hearing, the decision is not improper if other evidence supports

the determination); *see also Drouin v. Sullivan*, 966 F.2d 1255, 1258-59 (9th Cir. 1992) (observations

of ALJ during the hearing, along with other evidence, is substantial evidence for rejecting testimony).

Because the ALJ set forth other clear and convincing reasons for finding Plaintiff's subjective

complaints lacked credibility, the ALJ properly incorporated her personal observation into the decision

to reject Plaintiff's statements.  *See Nyman*, 779 F.2d at 531; *Drouin,* 966 F.2d at 1258-59.

### 3.      Limitations to which Plaintiff testified and the RFC

Finally, Plaintiff fails to identify the subjective complaints and limitations included in her hearing testimony that she believes should have been incorporated into the residual functional capacity by the ALJ.  Previously, the Ninth Circuit "reject[ed] any invitation to find that the ALJ failed to account for [the claimant's] injuries in some unspecified way" where "the RFC include[d] several physical limitations."  *See Valentine v. Comm'r SSA*, 574 F.3d 685, 692 n.2 (9th Cir. 2009).  In *Valentine*, the claimant asserted the ALJ failed to account for his impairments in the RFC yet failed to identify "what other physical limitations follow[ed]..., besides the limitations already listed in the RFC."  *Id.*

Likewise, courts determined failure to identify specific limitations that should have been incorporated into a mental residual functional capacity is fatal to a claimant's challenge.  *See, e.g., Kaminski v. Kijakazi*, 856 Fed. App'x 735, 736 (9th Cir. Aug. 17, 2021) (finding the plaintiff's challenge failed because he did "not specify what mental limitations… he claims the ALJ failed to include in the RFC determination"); *Hansen v. Berryhill*, 2018 WL 721660 at *4 (W.D. Wash. Feb. 6, 2018) ("Although Plaintiff argues that the ALJ erred in failing to account for the limitations caused by his ADHD in the RFC assessment, he does not identify which limitations were erroneously omitted, and has thus failed to state an allegation of error"); *Anderson v. Colvin*, 2015 WL 1194625 at *10 (D. Id. Mar. 16, 2015) (declining to review the limitations identified by the ALJ where the plaintiff failed to "specify which cumulative functional limitations were omitted from the RFC," though he claimed the RFC "failed to address the synergistic effects of his schizoaffective and bipolar disorders combined with his functional impairments").

Plaintiff asserts that the ALJ erred by rejecting her subjective statements concerning her symptoms and level of limitation, but Plaintiff does not identify any specific functional limitations caused by the severity of her symptoms that were not incorporated into the RFC.  (*See* Doc. 21 at 8-16.) The Court is unable to speculate as what limitations Plaintiff believes the ALJ should have incorporated into the RFC based upon her hearing testimony.  *See Valentine*, 574 F.3d at 692 n.2; *see also Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (noting the Court "has repeatedly admonished that [it] cannot 'manufacture arguments for an appellant'").

Moreover, it appears the RFC identified by the ALJ addresses the issues to which Plaintiff testified.  For example, Plaintiff testified that she began having difficulty remembering things at her prior work while dealing with her headaches and stress.  (Doc. 14-1 at 51-52, 54.)  In the RFC, the ALJ gave Plaintiff's "subjective symptoms such as … difficulty with memory, further consideration in finding… no work on assembly lines or similar production-based work."  (*Id.* at 19, 23.)  In addition, Plaintiff testified that she did not want to go out in public or leave her home due to concerns that she would see her former coworkers, and the ALJ indicated was addressed in the RFC by finding that Plaintiff had "moderate difficulties interacting with others" and "cannot work with the general public," which eliminated the possibility of interactions with former coworkers.  (*Id.* at 19, 23; *see also id.* at 55-59.)  Plaintiff also did not identify any physical limitations in her testimony that the ALJ did not address with the exertional and postural limitations in the RFC.  Because Plaintiff fails to identify any specific limitations to which she testified that were unaccounted for in the RFC, Plaintiff fails to show any error in the ALJ's analysis of her subjective complaints. *See Valentine*, 574 F.3d at 692; *Kaminski*, 856 Fed. App'x at 736.

## B.     Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, a treating physician's opinion is afforded the greatest weight, but the opinion is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes*, 881 F.2d at 751. Further, an ALJ generally gives more weight to an examining physician's opinion than a non-examining physician's opinion. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

An opinion is not binding upon the ALJ, and the ALJ may discount an opinion whether or not another physician contradicts it.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical physician only if the ALJ identifies a "clear and convincing" reason. *Lester*, 81 F.3d at 831.  A *contradicted* opinion of a treating or examining physician may only be rejected for "specific and legitimate reasons that are supported by substantial

evidence in the record." *Id.*, 81 F.3d at 830.  When there is conflicting evidence, the ALJ's role is to "determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The Court must uphold the ALJ's resolution of the conflict when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff asserts the ALJ did not "properly evaluate[] the medical opinions concerning [her] mental health," and erred in rejecting the opinions of Drs. Del Rosario, Greenspan, and McNairn. (Doc. 21 at 16-25.)  According to Plaintiff, "[a]ll the doctors who treated or examined Champ in person agree that she would struggle to sustain work under the stressors encountered in a usual workday," and the ALJ "improperly assigned great weight" to physicians "who never actually saw [Plaintiff] in person." (*Id.* at 24-25.)  Because the opinions of Drs. Del Rosario, Greenspan, and McNairn were contradicted by Dr. Len and the state agency physicians, the ALJ was required to identify specific and legitimate reasons for giving less weight to the examining and treating physicians' opinions. *See Lester*, 81 F.3d at 831.

### 1.     Dr. Del Rosario's Opinions

In June 2014, Plaintiff had an initial evaluation with Kaiser Permanente and later began treatment Dr. Salvadro Del Rosario.  (Doc. 14-1 at 935, 939.)  Dr. Del Rosario completed several medical source statements, dated June 22, 2016; June 8, 2017; and May 7, 2018.  (*Id.* at 478-480, 935-937, 939-941.)

#### a.     June 2016 statement

Dr. Del Rosario indicated Plaintiff was diagnosed with generalized anxiety disorder and post-traumatic stress disorder.  (Doc. 14-1 at 478.)  Dr. Del Rosario noted Plaintiff's symptoms included "psychological and physiological distress/reactions to cues/triggers," "[a]voidance of stimuli associated with event, negative beliefs about self, excessive anxiety and worry, difficulty controlling worry, [and] sleep disturbance." (*Id.*)  Dr. Del Rosario believed Plaintiff's symptoms would interfere with her capacity for employment "to the extent she was unable to maintain persistence and pace to engage in competitive employment." (*Id.*)  He opined Plaintiff's symptoms did not impair her ability to perform

activities of daily living.  (*Id.*)  In addition, Dr. Del Rosario believed Plaintiff had marked difficulty with maintaining social functioning; and moderate difficulty with maintaining concentration, persistence, or pace.  (*Id.* at 479.)  Dr. Del Rosario indicated Plaintiff had not experienced episodes of decompensation but believed she would have episodes of deterioration or decompensation in situation that cause her to withdraw.  (*Id.*)  Further, he agreed that "even a minimal increase in mental demands or change be predicted to cause … [Plaintiff] to decompensate."  (*Id.*)  Dr. Del Rosario concluded Plaintiff was likely to miss work four times per month due to psychologically based symptoms.  (*Id.*)

### b.    June 2017 statement

Dr. Del Rosario indicated Plaintiff's diagnoses included major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder.  (Doc. 14-1 at 935.)  At that time, Plaintiff was taking Zoloft 100mg daily.  (*Id.*)  Dr. Del Rosario noted Plaintiff's symptoms included "depressed mood, insomnia, poor concentration, anxiety, flashbacks of past harassment, [and] avoidance."  (*Id.*)  Dr. Del Rosario believed Plaintiff's symptoms would interfere with her ability to retain employment if she became employed, and she would miss work more than four times each month.  (*Id.* at 935-936.)  He opined Plaintiff had no difficulties with activities of daily living, but marked difficulties with maintaining social functioning, concentration, persistence, and pace.  (*Id.* at 935-936.)  Dr. Del Rosario also indicated Plaintiff had experienced episodes of decompensation, noting they occurred seldomly.  (*Id.* at 936.)  He also indicated that in his opinion, there was "medical documentation which shows the patient has a chronic disorder of at least two years' duration which has caused more than a minimal impairment of the ability to do basic work activities."  (*Id.*)  Dr. Del Rosario believed Plaintiff did not have "a documented current history of at least one year of inability to function outside of a highly supportive living situation."  (*Id.*)

### c.    May 2018 statement

Dr. Del Rosario indicated he last saw Plaintiff on May 7, 2018, at which time her diagnoses remained the same: major depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder.  (Doc. 14-1 at 939.)  He noted Plaintiff continued to have "depression, insomnia, anxiety, [and] flashbacks of past trauma," and she was taking Zoloft 50mg, 3 tabs daily.  (*Id.*)  Dr. Del Rosario again indicated Plaintiff had no difficulty with activities of daily living, but experienced marked

difficulty with maintaining social functioning and marked difficulties with concentration, persistence, or pace. (*Id.* at 939-40.)  He indicated Plaintiff had "repeated" episodes of decompensation. (*Id.* at 940.)  By that time, he believed Plaintiff had a documented history, at least one year in duration, of an inability to function outside of a highly supportive living situation. (*Id.*)  Dr. Del Rosario continued to believe Plaintiff would decompensate with a minimal increase in mental demands or change, and if employed, would be likely to miss work more than four times each month due to psychologically based symptoms. (*Id.*)

> d.      *ALJ's evaluation of the medical statements*

The ALJ indicated Dr. Del Rosario's opinions were "afforded little weight" because the opinions were "inconsistent with the []discussed largely normal findings and the claimant's relatively intact daily activities, as well as the other medical opinions in the record and treatment records reflecting improvement with treatment." (Doc. 14-1 at 25.)  The ALJ explained:

> For example, her reported capacity to go out to eat at restaurants, play games, and shop with friends, seems inconsistent with marked difficulties maintaining social functioning. Similarly, her capacity for various daily activities, including driving a car and engaging in various interests requiring concentration, such as crocheting, reading, and playing computer games, seems inconsistent with marked difficulties concentrating, persisting, or maintaining pace. There is also little objective evidence of repeated episodes of deterioration or decompensation documented in the record, as mentioned in medical expert Dr. Len's testimony. There is, for example, little evidence of psychiatric hospitalization or inability to leave the home [], as the claimant testified that she is able to go out despite her discomfort.

(*Id.*)

Plaintiff argues the ALJ erred in rejecting the limitations identified Dr. Del Rosario on these grounds. (Doc. 21 at 16-17, 25.) Plaintiff contends Dr. Del Rosario's opinion explains Plaintiff's "work[-]related limitations" and is not inconsistent with the objective evidence and her daily activities. (*Id.* at 18.) On the other hand, the Commissioner argues "[t]he ALJ gave good reasons" to support the weight given to the opinions of Dr. Del Rosario." (Doc. 25 at 17; *see also id.* at 17-19.)

> i.      *Plaintiff's daily activities*

An ALJ may reject an opinion when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d at 856; *see also Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011) (concluding the ALJ set forth a specific

1    and legitimate reason for rejecting a medical opinion when it conflicted with the claimant's activities).

2         The ALJ found Dr. Del Rosario's opinion was inconsistent with Plaintiff's "relatively intact

3    daily activities." (Doc. 14-1 at 25.)  As the ALJ observed, the ability to engage in activities such as

4    crochet, reading, and playing computer games appears inconsistent with the marked concentration,

5    persistence, or pace restrictions identified by Dr. Del Rosario.  On the other hand, the ALJ did not

6    identify any activities that addressed the limitations identified by Dr. Del Rosario related to Plaintiff's

7    ability to function outside of a highly supportive situation or her ability to handle increases in mental

8    demands without decompensation.  Indeed, while the ALJ identified activities outside of the home—

9    such as eating at a restaurant, playing games, and going shopping with friends— Plaintiff testified she

10   would not go out alone.  (*Id.* at 56-57.)  Moreover, Dr. Del Rosario repeatedly opined Plaintiff did not

11   have any limitations with her daily activities yet indicated she had marked limitations with social

12   functioning.  (*See Id.* at 478, 935-36, 939.)  Thus, the activities identified by the ALJ offer only limited

13   support for rejecting the opinions of Dr. Del Rosario.

14                   *ii.       Inconsistencies with the record*

15         An ALJ may reject limitations "unsupported by the record as a whole" and inconsistent with the

16   treatment a claimant received. *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010).  To

17   reject an opinion as inconsistent with treatment notes or medical record, the "ALJ must do more than

18   offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  The ALJ has a burden to

19   "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his

20   interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

21   The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective

22   findings or are contrary to the preponderant conclusions mandated by the objective findings does not

23   achieve the level of specificity our prior cases have required."  *Embrey*, 849 F.2d at 421-22.

24         The ALJ failed to carry this burden by broadly referring to "normal findings" or treatment notes

25   discussed previously in the summary of the medical evidence. The Court is unable to speculate— as the

26   Commissioner would have it—as to which findings the ALJ believed were inconsistent with what

27   specific limitations identified by Dr. Del Rosario.  For example, the Court is unable to determine

28   whether the ALJ believed there were "normal findings" that conflicted with the opinion that Plaintiff

would decompensate with an increase in mental demands or with minimal change or needed.  *See Jones v. Saul*, 2019 WL 4747702, at *4 (E.D. Cal. Sept. 30, 2019) (finding the ALJ erred when he "merely offered his conclusion" that physician's opinion was inconsistent with other evidence and failed to either identify specific objective findings from his summary of the medical record or provide "an explanation of how such evidence undermines [the physician's] opinion").  Likewise, the Court is unable to conclude whether the ALJ believed there were conflicts between the record Dr. Del Rosario's opinion that Plaintiff was likely to miss four or more days per month of work.  *See, e.g., Neva O. v. Saul*, 2020 WL 1154606, at *6 (W.D. Wa.. Mar. 10, 2020) (observing the medical record conflicted with a physician's opinion that the claimant would regularly miss work when the record did "not show a pattern of missed or failed appointments).  Consequently, the unspecified inconsistencies with the medical record do not support the ALJ's evaluation of the limitations opined by Dr. Del Rosario.

### iii.    Conflict with other medical opinions

The ALJ indicated the opinions of Dr. Del Rosario were "inconsistent with … the other medical opinions in the record."  (Doc. 14-1 at 25.)  Again, however, the ALJ failed to identify which medical opinions she found conflicted with the medical statements from Dr. Del Rosario.

As the Ninth Circuit explained, "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  Because the ALJ failed to identify and resolve the conflict among the medical opinions in the record, she erred rejecting the opinions of Dr. Del Rosario.[3]  *See id.*

### iv.    Evidence of decompensation

The ALJ found "little objective evidence" documented in the record of Plaintiff's "repeated episodes of deterioration or decompensation" that Dr. Del Rosario indicated.  (Doc. 14-1 at 25.)  The

---

[3] Moreover, a review of the record indicates the physicians did not completely disagree with the opinion of Dr. Del Rosario.  For example, Dr. Greenspan also opined Plaintiff "was likely to deteriorate under normal work conditions," as the ALJ acknowledged.  (Doc. 14-1 at 24.)

Further, the ALJ called upon a medical expert, Dr. Len, to testify regarding Plaintiff's limitations.  The ALJ asked Dr. Len how she felt about Dr. Del Rosario's opinion in May 2018, which indicated marked limitations.  (Doc. 14-1 at 44.)  In reviewing the exhibit, Dr. Len agreed with Dr. Del Rosario that Plaintiff had "a documented current history of at least one year of an inability to function outside of a highly supported living situation."  (*Id.* at 46-47.)  Dr. Len explained that Plaintiff had "a lot of family support" and "might be worse without her husband to help her out" and "might be worse without her husband to help her out" and "if he wasn't in the picture."  (*Id.* at 47.)

20

ALJ noted that at the hearing, Dr. Len indicated there was "little objective evidence of repeated episodes of deterioration or decompensation document in the record." (*Id.*)  The ALJ explained: "There is, for example, little objective evidence of psychiatric hospitalization or inability to leave the home, as the claimant testified that she is able to go out despite her discomfort." (*Id.*)

At the hearing, medical expert Dr. Len acknowledged that the record included a report that in 2016, Plaintiff "had about one panic attack per week." (Doc. 14-1 at 40.)  Dr. Len opined Plaintiff "had mild agoraphobia" that was "not severe enough to impair her functioning because she seems to be functioning, despite the feelings of it being difficult to leave the house." (*Id.*)  The ALJ inquired whether Dr. Len agreed with the opinion of Dr. Del Rosario that Plaintiff had "repeated episodes of decompensation" in May 2018. (*Id.* at 44.)  Dr. Len opined she did not "see the situations with the repeated episodes of decompensation," but indicated, "I don't know if there's more specific information no that that I missed" as she focused "on the period of onset." (*Id.* at 44-46.)

Notably, under the Regulations, "[e]pisodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by loss of adaptive functioning, as manifested by difficulties in performing activities in daily living, maintaining social relationships, or maintaining concentration, persistence or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or combination of the two)."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 (C)(4).  As a result, "[e]pisodes of decompensation also include panic attacks, since those meet the requirement of a symptom or sign requiring retreat to a less stressful situation." *Arroyo v. Astrue*,  2010 WL 4392902, at *27 (E.D. Cal. Oct. 29, 2010); *see also Holohan*, 246 F.3d at 1204, n. 4 (characterizing the claimant's panic attacks as decompensation, because her symptoms were exacerbated and she would withdraw from the stressor, which could include too many people); *Rodriguez v. Astrue*, 2011 (E.D. Cal. Apr. 7, 2011) (finding error where "[t]he ALJ did not consider whether Plaintiff's panic attacks … constituted a degree of decompensation within the regulatory objective").

Because the ALJ referred only to a lack of hospitalization and the ability to leave the house— without addressing Plaintiff's panic attacks—the Court is unable to find the ALJ properly rejected the opinion of Dr. Del Rosario that Plaintiff suffered repeated episodes of decompensation.

2.      Dr. Greenspan's Opinion

Dr. Ivan Greenspan performed a Qualified Medical Examination on September 8, 2015, "to determine if [Plaintiff] had sustained an industrial psychiatric injury." (Doc. 14-1 at 351-52.)  Plaintiff reported she had a lack of self-esteem, suffered from daily depression, had memory problems, was "afraid of making a mistake," and had "anxiety attacks frequently at work." (*Id.* at 352, 360-361.) Plaintiff said she wanted to leave her job but was concerned she would "get a bad reference" and then "lack[ed] confidence to get a new job." (*Id.* at 362.)  Dr. Greenspan observed that Plaintiff "was punctual and cooperative," "maintained appropriate eye contact and had a pleasant attitude under examination." (*Id.* at 353.)  He opined Plaintiff's "affect was appropriate to the situational content with no evidence incongruity," though "sad as she described the situation at work" and she "became tearful occasionally during the interview." (*Id.* at 354.)  Dr. Greenspan found Plaintiff "was able to recall 4 of 5 items after a five-minute delay." (*Id.*)  He noted Plaintiff "had significant difficulty … with serial seven and serial three tasks," as she was slow in her performance and made errors. (*Id.*)

Dr. Greenspan diagnosed Plaintiff with major depressive disorder, moderate, with anxiety. (Doc. 14-1 at 379.)  He opined Plaintiff had "mild to moderate impairment in the areas of activities of daily living," noting Plaintiff reported impairments in her appetite and eating habits and sleep. (*Id.* at 382, emphasis omitted.)  Dr. Greenspan noted Plaintiff "continue[d] to care for her personal hygiene and grooming despite her depressed mood," but also had "miss[ed] work and reduce[d] her social interactions after work due to her depression." (*Id.*)  Dr. Greenspan indicated Plaintiff had become "dependent on her husband and needs emotional support from him." (*Id.*)  Dr. Greenspan also found "mild to moderate impairments in the area of social interaction," noting Plaintiff "disclaimed having difficulty getting along with family members, friends, neighbors, grocery clerks, landlords, or bus drivers," but "reported difficulty interacting with her coworkers" and described "sensitive[ity] to criticism." (*Id.* at 383, emphasis omitted.)  Next, Dr. Greenspan found mild impairments with concentration, persistence, and pace, noting Plaintiff's ability to recall items but difficulty with the mathematical questions. (*Id.*)  Finally, Dr. Greenspan concluded Plaintiff had "mild to moderate impairment in the area of deterioration or decompensation in a work-like setting." (*Id.*)  He noted:

> The applicant reported having numerous break downs at work in which she was
> crying at her cubicle.  She described being glad that she was in the back so her

22

coworkers could not see her crying. Although she was hidden, crying at work can be a significant distraction to her coworkers. She may well be hidden but it is reasonable to believe some of her coworkers are aware of her crying. Crying is also interfering with her ability to function at work. She cannot attend meetings or call customers while she is crying. She also cannot maintain mental focus while experiencing emotional symptoms of sufficient severity to evoke tears. As well, at home she is avoiding her husband by spending extra time in the bath. She is developing avoidant behaviors in order to limit conflict and emotional upset. Her impairment is not considered severe because she is still interacting with people and continuing her usual activities but she is likely to deteriorate under normal work conditions.

(*Id.* at 383-84, emphasis omitted.)

Dr. Greenspan opined there were "no restrictions which would allow [Plaintiff] to return to work without experiencing a worsening of her condition." (Doc. 14-1 at 384.) He recommended Plaintiff "remain off work … for a period of three to six months depending on the course of her treatment and recovery." (*Id.*) According to Dr. Greenspan, Plaintiff "may…be able to return to work at Account Control Technology with restrictions" from working with the co-workers "who seem[ed] to be the main triggers for her insecurity and indecisiveness." (*Id.*)

   a.   *ALJ's evaluation of the opinion*

The ALJ indicated varying degrees of weight were given to the opinions of Dr. Greenspan. (Doc. 14-1 at 24.) The ALJ observed, "though Dr. Greenspan stated the claimant was likely to deteriorate under normal work conditions … the undersigned notes he also stated that her former coworkers 'seem[ed] to be the main triggers for her insecurity and indecisiveness,' suggesting that such severe limitations would not necessarily apply if she had no contact with the triggering individuals." (*Id.*) The ALJ gave "some weight" to the opinions, "to the extent that moderate difficulties with social functioning and maintain concentration, persistence, or pace, are consistent with the documented objective evidence, including treatment records documenting improvement with treatment, and the claimant's relatively intact reported daily activities." (*Id.*) Further, the ALJ stated:

The undersigned gives great weight to Dr. Greenspan's statement that the claimant's likelihood of deterioration appeared mainly triggered by her former coworkers, particularly as she otherwise described generally getting along with authority figures without problems, in finding no significant limitations interacting with supervisors but inability to work with the general public, as she testified consistently with the record that the possibility of seeing the triggering individuals caused significant anxiety.

(*Id.*)

b.      *Analysis*

Plaintiff argues that "the ALJ mischaracterized Dr. Greenspan's opinion." (Doc. 21 at 21.) According to Plaintiff, "Although Dr. Greenspan refers to situations where Champ would cry at her old job, Dr. Greenspan did not limit his opinion to interactions with Champ's former coworkers." (*Id.*) She observes, "Dr. Greenspan noted instances where Champ would avoid her husband at home" and stated she was "developing avoidant behaviors to limit conflict and avoiding becoming upset." (*Id.*) Plaintiff also observes: "Dr. Greenspan specifically stated that [Plaintiff] 'is likely to deteriorate under normal work conditions.'" (*Id.*) Plaintiff contends, "Dr. Greenspan's statement cannot reasonably [be] interpreted as being limited to situations involving Champ's former coworkers." (*Id.*)

On the other hand, the Commissioner argues Plaintiff fails "to demonstrate that the ALJ's conclusion was unreasonable, especially since Dr. Greenspan was evaluating whether Plaintiff could perform her old job." (Doc. 25 at 20, citing AR 350-56, 386 [Doc. 14-1 at 354-60, 390].) The Commissioner asserts "Plaintiff's argument takes 'normal work circumstances' out of context, while the ALJ's interpretation is consistent with the factual circumstances that prompted Dr. Greenspan's report, as well as that report itself." (*Id.*)

Notably, Dr. Greenspan was performing a QME examination, and issues included whether Plaintiff "sustained an industrial psychiatric injury," "whether there was permanent impairment and if work restrictions would be necessary." (Doc. 14-1 at 352.) Dr. Greenspan believed Plaintiff was "likely to continue to worsen if she remains at work in the same conditions," and noted it was "unclear at this time if she will be able to return to work for the same employer or she will need work restrictions," including "restrictions from working with [her supervisor] or [her manager] who seem to be the main triggers for her insecurity and indecisiveness." (*Id.* at 384, 391.) Further, the ALJ noted Plaintiff "described generally getting along with authority figures without problems," and reported "consistently … that the possibility of seeing the triggering individuals caused significant anxiety." (*Id.* at 24.) On this record—where Dr. Greenspan also suggested restrictions from Plaintiff's coworkers could be appropriate for her to return to that for the same employer and did not opine Plaintiff was precluded from *all* work—the ALJ made a reasonable interpretation of the opinion that the "severe limitations would not necessarily apply if she had no contact with the triggering individuals." (*See id.*)

It does not appear the ALJ mischaracterized the findings of Dr. Greenspan, whose opinions were quoted by the ALJ in her opinion.  Further, "where the evidence is susceptible to more than one rational interpretation," the Court must defer to the ALJ's conclusion.  *Magallanes*, 881 F.2d at 750; *see also Tommasetti v. Astrue,* 533 F.3d 1035, 1038 (9th Cir. 2008) ("The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record").  Consequently, Plaintiff fails to show error by the ALJ in characterizing the opinions of Dr. Greenspan.

### 3.      Dr. McNairn's Opinion

Plaintiff had a psychological consultative examination performed by Dr. James McNairn on September 17, 2016.  (Doc. 14-1 at 900-907.)  Plaintiff "reported a depressed mood with low energy, social withdrawal, impaired concentration/attention, and low self-esteem." (*Id.* at 900.)  In addition, she described "panic attacks with shortness of breath, rapid heartbeat, sweating, dizziness, and a desire to escape." (*Id.*)  Plaintiff told Dr. McNairn her panic attacks occurred on a weekly basis and lasted up to 45 minutes.  (*Id.*)  In addition, she stated "she stopped working [in] September 2015 due to work stress." (*Id.* at 901.)  Plaintiff reported she completed household chores, cared for her pet dog, bathed daily, and had three meals daily. (*Id.*)  She said she visited with "friends, family, grandchildren, and neighbors." (*Id.*)  Plaintiff also told Dr. McNairn that she had "several friends and they shop, eat at restaurants, and play games." (*Id.*).

Dr. McNairn observed that Plaintiff "displayed a normal level of alertness and stamina" during the evaluation," as "[s]he followed instructions, listened to questions, and responded in turn."  (Doc. 14-1 at 902.)  He noted Plaintiff "was cooperative and friendly throughout the interview," "appeared to respond to questions to the best of her ability" and had appropriate eye contact.  (*Id.*)  Dr. McNairn found Plaintiff had organized and logical thought processes.  (*Id.*)  He observed that Plaintiff's "[a]ffect was restricted and tearful at times."  (*Id.* at 903.)  Plaintiff "recalled five digits forwards and three digits backwards" and "remembered 2/3 words after brief interference tasks." (*Id.*)  Dr. McNairn opined Plaintiffs remote memory was "[i]ntact based on her ability to provide historical information about her life."  (*Id.*)  He tested Plaintiff's concentration by asking her to spell the word "world," which she did forwards but not backwards.  (*Id.*)  In addition, Dr. McNairn observed that Plaintiff "followed simple and short instructions when given verbal directions to the interview room for [the] evaluation."  (*Id.*)

25

1    Dr. McNairn diagnosed Plaintiff with "[u]nspecified depressive disorder" and "Panic

2    disorder," and opined her "symptom severity [was] in the moderate range."  (Doc. 14-1 at 903-04.)

3    Dr. McNairn opined Plaintiff's did not have any impairment with performing simple and repetitive

4    tasks, but she was "mildly impaired" with performance of complex and detailed tasks.  (*Id.* at 904.)

5    He determined Plaintiff was "mildly to moderately impaired" with "the ability to interact with

6    coworkers and the public" and maintain regular attendance.  (*Id.*)  In addition, Dr. McNairn opined

7    Plaintiff was "moderately impaired" with the ability to accept instructions from a supervisor.  (*Id.*)

8    According to Dr. McNairn, Plaintiff's ability to complete a normal workday and workweek without

9    interruptions from her psychological problems was moderately impaired.  (*Id.*)  Dr. McNairn

10   concluded Plaintiff's "ability to deal with the usual stress encountered in a competitive workplace is

11   moderately to seriously impaired."  (*Id.*)

12            a.       *The ALJ's evaluation of the opinions*

13           The ALJ noted she gave "some weight" to Dr. McNairn's opinions related to "moderate

14   difficulties with social functioning and maintaining concentration, persistence, or pace."  (Doc. 14-1 at

15   24.)  The ALJ gave "little weight to Dr. McNairn's more restrictive limitations, as they seem to pertain

16   to the situation when the claimant was working with these former coworkers, and she described

17   essentially functioning well when there was no risk of seeing these individuals."  (*Id.*)  The ALJ "also

18   note[d] that the claimant's generally appropriate behavior at the hearing and various appointments, as

19   well as her intact relationships with friends and family and ability to shop and leave the home despite

20   discomfort, suggest that she generally has no significant limitations interacting with coworkers and

21   supervisors."  (*Id.*)

22           Plaintiff observes that "[t]he ALJ appears to reject Dr. McNair's opinion regarding [Plaintiff's]

23   ability to deal with usual stress," but contends the analysis by the ALJ "is problematic."  (Doc. 21 at

24   20.)  According to Plaintiff, the ALJ mischaracterized the findings of Dr. McNair and her hearing

25   testimony to reject the limitations.  (*Id.* at 20-21.)  On the other hand, the Commissioner asserts the ALJ

26   properly addressed the record when evaluating the opinion of Dr. McNair.  (Doc. 25 at 21.)

27            b.       *Plaintiff's level of activity*

28           As discussed above, an ALJ may reject a medical opinion when the limitations identified by a

26

physician "appear to be inconsistent with the level of activity" for the claimant.  *Rollins*, 261 F.3d at 856; *see also Fisher*, 429 Fed. App'x at 652.  However, an ALJ errs where there is no explanation of how a claimant's activities correlated to limitations rejected by the ALJ.  *See Hensley v. Colvin*, 2015 WL 5601183, at *4 (E.D. Cal. Sept. 22, 2015).

For example, in *Hensley*, examining physicians opined the "plaintiff had significant limitations in accepting instructions from supervisors, interacting with coworkers and the general public, and dealing with the usual stress of competitive work."  *Id.*  In addition, physicians determined Hensley "was significantly impaired in her ability to complete a normal workday or workweek without interruption from psychological symptoms."  *Id.* The ALJ rejected the limitations based upon Hensley's daily activities, noting she was "able to take care of her personal hygiene, prepare simple meals, prepare housework, drive a car, shop for groceries, and pay bills."  *Id.*  However, the Court found error because the ALJ "did not explain how the ability to perform any of these activities undermines these physicians' opinions."  *Id.*  The Court explained: "It is unclear how the ability to perform any of these menial tasks has any relevance to these physicians' opinions that plaintiff is significantly impaired her ability to accept instructions from supervisors, interact with coworkers and the general public, and to deal with the stress of a competitive work week."  *Id.* Further, the Court found "the ability to perform the activities identified by the ALJ does not demonstrate an ability to deal with stress."  *Id.* Thus, the Court concluded "the ALJ erred in relying on plaintiff's daily activities as a basis for rejecting the examining physician's (sic) opinions."  *Id.*

Similarly, here, the ALJ fails to explain how Plaintiff's ability to maintain relationships with family members and friends indicates an ability to interact properly with coworkers and supervisors.  It is also unclear how Plaintiff's presentation at the hearing or appointments—which are of limited duration—demonstrate an ability to have appropriate interactions with supervisors and accept instructions from supervisors on a daily basis or handle the stress of a work environment.  There also is no explanation from the ALJ as to how Plaintiff's ability to leave her home— which she did with family members and friends— undermines the conclusion that she was impaired with "the ability to interact with coworkers" and "moderately impaired" with the ability to accept instructions from a supervisor.  Finally, the ALJ has not identified any activities that Plaintiff engaged in on a sustained

basis to contradict the opinions from Dr. McNairn that Plaintiff was "moderately impaired" with the ability to complete a normal workday and workweek, or that her "ability to deal with the usual [workplace] stress … is moderately to seriously impaired."  Consequently, the Court is unable to find Plaintiff's level of activity support the decision of the ALJ to reject the moderate to severe impairments identified by Dr. McNairn.  *See Hensley*, 2015 WL 5601183, at *4.

          *c.*     *Characterization of the opinion*

Plaintiff contends the ALJ mischaracterized Dr. McNairn's medical opinions by stating that "they seem to pertain to the situation when the claimant was working with these former coworkers." (Doc. 21 at 20; Doc. 14-1 at 24.)  Notably, in contrast to the opinion of Dr. Greenspan, there is no evidence in the medical statement to suggest the limitations identified by Dr. McNairn pertained to her former employment.  To the contrary, Dr. McNairn indicated that his functional assessment / medical source statement was based in part on Plaintiff's "current mental status" in April 2017.  (Doc. 14-1 at 904.)  Therefore, the ALJ erred to the extent that she rejected the limitations identified by Dr. McNairn on these grounds.

## C.  Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v. Ventura*, 537 U.S. 12, 16 (2002).  Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v*, 80 F.3d at 1292.  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed.  *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ failed to identify legally sufficient reasons for rejecting the limitations identified by

Plaintiff's treating physician and an examining physician.  These limitations are related to the determination of Plaintiff's mental residual functional capacity, and the ultimate determination of whether Plaintiff can perform work in the national economy.  Because the ALJ failed to resolve conflicts in the medical opinions regarding mental Plaintiff's limitations, the matter should be remanded for the ALJ to re-evaluate the medical evidence and identify legally sufficient grounds to support the decision. *See Moisa*, 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set for above, the Court finds the ALJ erred in evaluating the medical opinions and the administrative decision cannot be upheld.  *See Sanchez*, 812 F.2d at 510.  Accordingly, the Court **ORDERS**:

1.	Plaintiff's appeal of the administrative decision (Doc. 21) is **GRANTED**.

2.	The Commissioner's request that the administrative decision be affirmed (Doc. 25) is **DENIED**.

3.	The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

4.	The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Barbara Champ, and against Defendant Kilolo Kijakazi, Acting Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   __December 20, 2021__	_____ **/s/ Jennifer L. Thurston**
	CHIEF UNITED STATES MAGISTRATE JUDGE